CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 03 2014

JULIA C. DUDLEY, CLERK
BY: /s/
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| RALPH LEON JACKSON, ) | |
| ) | Criminal No. 5:10cr00026 |
| Petitioner, ) | |
| ) | |
| v. ) | 2255 MEMORANDUM OPINION |
| ) | |
| UNITED STATES OF AMERICA, ) | By: Samuel G. Wilson |
| ) | United States District Judge |
| Respondent. ) | |

Ralph Leon Jackson filed this 28 U.S.C. § 2255 motion to vacate, alleging that his counsel rendered ineffective assistance by advising him that voluntary intoxication was not a defense to murder charges that carried a possible death sentence, which led Jackson to accept a plea agreement to avoid the death penalty. The court, *sua sponte*, denied Jackson's motion essentially because Jackson received the benefit of his plea bargain—removing the specter of a death sentence. United States v. Jackson, 2012 WL 681842 (W.D. Va. Mar. 1, 2012). On appeal, the Fourth Circuit expressed no view as to the merits of Jackson's claim but held that the better practice would have been to await a response from the government and, if necessary, hold an evidentiary hearing, and it remanded the case to this court. United States v. Jackson, 2014 WL 486673 (4th Cir. Feb. 7, 2014). Having now held an evidentiary hearing, the court concludes that Jackson's counsel provided objectively reasonable advice about the use of evidence of intoxication and that, in any event, counsel's advice did not prejudice Jackson. Accordingly, the court denies his motion.

I.

The background facts relevant to the issue before this court on remand are detailed more fully in the court's earlier memorandum opinion dated March 1, 2012. Though the court will not

repeat all of those matters here, it repeats enough background information to provide context for this court's current findings of fact and decision.

On April 5, 2010, in a random act of violence at a scenic overlook on the Blue Ridge Parkway, Jackson shot and killed Timothy Phillip Davis and seriously wounded Davis' friend Christina Shay Floyd in an attempt to kill her. A federal grand jury indicted Jackson on five counts, two of which carried possible death sentences.[1] The court appointed Frederick T. Heblich, an experienced federal defender, and Rhonda Quagliana, an experienced trial lawyer, to represent Jackson. Heblich anticipated his appointment and had already begun investigating the case months earlier. (Hr'g Tr. 62:4-63:8) Heblich arranged for a mental examination to determine "whether there was an indication of a mental disease or defect that might provide a basis for an insanity defense" and to obtain any "valuable mitigation information." (Hr'g Tr. 16:14-17:2) Bruce J. Cohen, M.D., who conducted the examination, "[did] not find evidence of an underlying psychiatric illness such as depression, bipolar disorder, or schizophrenia, or a medical illness leading to changes in mental status" but did find, based on Jackson's report, that Jackson may "have been impaired at the time of the offense, likely due to a combination of intoxication and emotional distress." (Br. in Supp. of Mot. to Vacate, Ex. A, at 7, ECF No. 55-1) On December 7, 2010, Heblich met with Jackson to discuss Dr. Cohen's findings and a proposed

---

[1] Count One charged Jackson with assaulting Floyd with intent to commit murder on land that is within the United States' concurrent jurisdiction in violation of 18 U.S.C. §§ 7(3) and 113(a)(1); Count Two charged Jackson with assaulting Floyd with a dangerous weapon with intent to do bodily harm on land that is within the United States' concurrent jurisdiction in violation of 18 U.S.C. §§ 7(3) and 113(a)(3); Count Three charged Jackson with knowingly using, carrying, and discharging a firearm, a 20-gauge shotgun, during and in relation to the crimes of violence alleged in Counts One and Two; Count Four charged Jackson with willfully, deliberately, maliciously, and with premeditation and malice aforethought killing Davis on land that is within the United States' concurrent jurisdiction in violation of 18 U.S.C. §§ 7(3) and 1111(a); and Count Five charged Jackson with using a firearm during and in relation to the murder alleged in Count Four in violation of 18 U.S.C. §§ 924(c)(1) and 924(j). Counts Four and Five carried possible death sentences.

2

plea agreement from the government, which offered a life sentence. That same day, Heblich also prepared a letter to Jackson summarizing their meeting:

> [E]ven though you have signed the plea agreement, I am going to keep it in my file until you authorize me to give it to the government. Also, I want to repeat that the plea agreement has no effect unless and until you appear before a judge and enter a guilty plea. I explained to you that if you went to trial and were not convicted of first-degree murder, you would very likely receive a sentence that for all practical purposes would be a sentence of life imprisonment [due to your age of 57] . . . If you went to trial and you were convicted of second-degree murder instead of first degree murder, you would be subject to a maximum sentence of life . . . [s]o probably the best you could hope for is a sentence of about 50 years, and to attempt to get it you would have to risk being liable to a death sentence. Parole was abolished in the federal system more than 20 years ago, so if you got a life sentence or a sentence of 50 years, the result is going to be the same . . . While advising you to accept the plea agreement, I want to remind you that the decision is entirely yours. If you want to go to trial instead, we are prepared to represent you.

(ECF No. 94-1, at 1-2)

A few months later, Jackson chose to accept the government's offer and enter a guilty plea. The court conducted a thorough Rule 11 plea colloquy in which Jackson "acknowledged among other things that the [stipulated] statement of facts [in support of the plea] was accurate, that he was pleading guilty because he was in fact guilty, that his plea agreement called for him to receive a life sentence, and that he was satisfied with the representation and advice he had received from counsel." Jackson, 2012 WL 681842, at *4. The court accepted his plea and later sentenced Jackson to life in prison plus 420 months consecutive.

Approximately eight months later, Jackson moved to vacate the judgment on the ground that he received ineffective assistance because his counsel failed "to raise a defense of mental impairment constituting manslaughter." (ECF No. 54 at 4) Jackson further alleged that his counsel "said [voluntary intoxication] was not a mitigating factor and could not be raised in trial or before the court." (Id.) According to Jackson, "[he] would have gone to jury trial in lieu of

3

pleading guilty had counsel correctly advised [him] mental impairment was a defense to demonstrate [he] did not have the means [*sic*] rea to commit first degree murder." (Jackson Decl. at ¶ 9, ECF No. 54-1 at 3) Instead he "pled guilty to life imprisonment and 440 [*sic*] months consecutively imposed for a crime he is innocent of. That is, first degree murder." (Br. in Supp. of § 2255 Mot. at 2, ECF No. 55 at 6)

The court initially found Jackson's motion to be frivolous and denied it, *sua sponte*, because evidence of voluntary intoxication would not have been admissible to reduce the homicide from murder to manslaughter, and Jackson still would have faced a possible death sentence if convicted. Jackson appealed, and the Fourth Circuit granted a limited certificate of appealability as to whether counsel misadvised Jackson that evidence of intoxication would not be admissible to reduce his crime from first degree murder to second degree murder. The Fourth Circuit remanded the case with direction to this court to more fully develop the record through a response and possibly a hearing. The court has since held an evidentiary hearing in which Heblich and Jackson testified.

Heblich testified he did not advise Jackson that evidence of intoxication would be inadmissible, (Hr'g Tr. 33:4-5), or of no possible benefit to Jackson. (Hr'g Tr. 32:20-25) According to Heblich, he was familiar with the law on voluntary intoxication (Hr'g Tr. 29:12-30:7) and simply attempted to explain the functionality of the "defense" in layman's terms. (Hr'g Tr. 32:17-25) Thus, Heblich told Jackson that voluntary intoxication was not a "defense" in the way that insanity was a "defense," (Hr'g Tr. 23:1-6, 32:4-33:12), and that he could not be "acquitted" on the basis of voluntary intoxication or any of his other "mitigating" evidence, such

as mistake of identity.[2] (Hr'g Tr. 34:2-8) Heblich testified that he told Jackson the evidence could be used at trial or for mitigation purposes at sentencing, but at best, voluntary intoxication could only reduce first degree murder to second degree murder. (Hr'g Tr. 22:13-25) In Heblich's view, those chances were slim. (Hr'g Tr. 43:20-44:13, 59:5-11)

In Jackson's initial video recorded statements to authorities following his arrest, Jackson denied being intoxicated on the date of the offense. (Hr'g Tr. 39:11-25) Family members and other individuals whom Heblich had interviewed not long after the offense also denied any awareness of Jackson's alleged intoxication. (Hr'g Tr. 35:9-21, 62:4-63:8) According to Heblich, Jackson's report to Dr. Cohen that he was intoxicated from having consumed two bottles of wine and seven to eight pain killers and from having smoked marijuana was contrary to Jackson's own earlier accounts. (Hr'g Tr. 17:6-10); (see Hr'g Tr. 40:1-12) And even in the unlikely event that Jackson were to succeed in using voluntary intoxication as a defense, which probably would have required Jackson to testify at trial, the best Jackson could have expected, in Heblich's view, still would have been the practical equivalent of a life sentence. Because Jackson would have to have risked receiving a death sentence to obtain essentially the same result, Heblich advised Jackson to accept the government's offer of a life sentence. (Hr'g Tr. 51:3-11) Heblich testified that he sent Jackson the December 7 letter memorializing their discussions and his advice.

Jackson testified at the evidentiary hearing that he told Heblich in some of their first meetings that he had a long history of drug and alcohol abuse and was intoxicated on the day of the offense, (Hr'g Tr. 65:1-66:3), and when Jackson asked whether this meant he had a defense,

---

[2] Jackson claimed he thought he shot at his son-in-law who had allegedly sexually abused Jackson's daughter. (ECF No. 37 at 3-4) The claim fails to account for his vicious attack on Floyd.

5

Heblich told him intoxication was not an "allowable defense." (Hr'g Tr. 66:8-10; 68:13-18) Jackson, however, did not dispute receiving the letter or the advice Heblich said he gave. (Hr'g Tr. 83:10-20) ("You heard him testify he had that discussion with you, that voluntary intoxication and other evidence could reduce first degree murder to second degree murder, right? Yes. You don't dispute that testimony, do you? No."); (see Hr'g Tr. 82:19-23) ("Did he tell you that [voluntary intoxication] would be helpful -- it could possibly be used, along with other evidence, to reduce it to second degree murder? . . . He may have.")[3] Nonetheless, Jackson maintained he did not understand Heblich's advice to mean he had a defense at trial. According to Jackson, he thought he had "no defense." (Hr'g Tr. 69:6-7; 71:17-25, 73:12-13)

Jackson also did not dispute that Heblich advised him he faced a possible death sentence if he proceeded to trial. In fact, at the evidentiary hearing, Jackson conceded that a death sentence was not simply a possibility, but rather "a probability." (Hr'g Tr. 78:4-5) Jackson testified, though, that because he wanted to avoid a likely death sentence, he chose to sign the plea agreement and plead guilty in exchange for life imprisonment. (Hr'g Tr. 69:14-25; 73:25-74:11) Jackson acknowledged that he now understands voluntary intoxication would not have been a good defense; that it could only have reduced first degree murder to second degree murder; that he would have faced possible death; and that at best, he would have received a 50 year sentence. (Hr'g Tr. 76:2-77:2) Notwithstanding, Jackson said he still would have proceeded to trial in order to tell his "story," which he claimed for the first time was not accurately portrayed at his guilty plea hearing in the stipulated statement of facts, (Hr'g Tr. 75:2-11, 76:22-77:11, 79:11-80:7, 95:10-16), a statement he acknowledged under oath during his guilty plea

---

[3] Jackson first denied Heblich ever explained to him what Heblich meant by saying voluntary intoxication was not a "complete defense" and that it could be used to reduce first degree murder to second degree murder but later changed his testimony. (Hr'g Tr. 69:8-11, 73:2-8)

6

colloquy to be an accurate statement. (Plea Tr. 32:10-33:11) ("The Court: Mr. Jackson, you have heard a summary of the evidence against you. Did you hear anything in that summary with which you disagreed? The Defendant: No, sir.")

II.

The court credits Heblich's testimony and, to the extent that Jackson's testimony is inconsistent with it, finds that Jackson's testimony is not credible. Finding that Heblich rendered reasonable advice and that it would have been unreasonable, in any event, for Jackson to have rejected the government's plea offer that removed a possible death sentence, achieving Jackson's principal objective, the court rejects Jackson's ineffective assistance of counsel claim.

To establish a claim of ineffective assistance, Jackson must show both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 669 (1984). A court's evaluation of deficient performance is "highly deferential." Strickland, 466 U.S. at 689. And courts apply a strong presumption that counsel's performance was within the "wide range" of reasonable professional assistance. Id.; see also Fields v. Att'y Gen. of Md., 956 F.2d 1290, 1297-99 (4th Cir. 1992); Hutchins v. Garrison, 724 F.2d 1425, 1430-31 (4th Cir. 1983); Marzullo v. Maryland, 561 F.2d 540 (4th Cir. 1977). To overcome this presumption, a movant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. That is, the representation must fall below an objective standard of reasonableness, amounting to "incompetence under 'prevailing professional norms.'" Premo v. Moore, 131 S. Ct. 733, 740 (2011) (quoting Strickland, 466 U.S. at 690).

Jackson has not shown that Heblich's representation fell below an objective standard of reasonableness. To the contrary, Heblich correctly advised Jackson that voluntary intoxication is

7

not a defense to murder in the way that insanity is a defense. Although the evidence may be admissible to reduce first degree murder to second degree murder in the rare instance where a defendant is so intoxicated that he cannot form the requisite specific intent, it may not be used as an excuse or to reduce murder to manslaughter.[4] United States v. Fuller, 436 Fed. App'x 167, 168 (4th Cir. 2011) ("[V]oluntary intoxication is a defense only to specific intent crimes."); United States v. Jewett, 438 F.2d 495, 499 (8th Cir. 1971) ("[M]urder in the second degree (18 U.S.C. § 1111 . . . do[es] not require a specific intent (willful, deliberate, malicious and premeditated), as distinguished from a general intent to kill."); see United States v. Williams, 342 F.3d 350, 356 (4th Cir. 2003).[5] Though Heblich spoke to Jackson in layman's terms rather

---

[4] As this court initially read Jackson's § 2255 motion, Jackson premised the motion on his mistaken belief that voluntary intoxication could reduce murder to manslaughter. (Br. in Support of § 2255 Mot. at 6, ECF No. 55 at 10) ("[evidence of intoxication] could have resulted in a lesser included offense of manslaughter."); see (Id. at 8, 12) ("[Heblich] full well knew that movant's defense was tailor made for mental impairment that will, in future jury trial, both clearly and convincingly demonstrate to a jury that the crime is a manslaughter, not a premeditated first degree murder."); (Id. at 15, 19) ("an investigation would have revealed the fact movant had a defense quite capable of resulting in a manslaughter in jury trial"); (Id. at 16, 20) ("movant would have gone to jury trial and clearly and convincingly shown the jury that [Jackson] did not have the specific intent to commit first degree murder. A verdict of manslaughter would have been probable.") And despite present knowledge to the contrary, Jackson testified, albeit in contradictory fashion, that he still believes he could attain that goal. (Hr'g Tr. 81:21-82:5) ("Why did you put [that you could reduce murder down to manslaughter] in your motion? That it was a possibility."); (Hr'g Tr. 83:21-25) ("[D]o you think that this voluntary intoxication would be -- would do any better than second degree murder? With mitigating factors, possibly . . . I think if all the factors are brought into play, then there's a possibility it may.") (Hr'g Tr. 77:9-11) ("I think with all the entire picture that's painted, I think things would probably go in my favor.")

[5] "Intoxication at common law was no defense to the crime of murder. It could neither justify an acquittal, nor reduce common law murder to manslaughter. From an early day to this hour, the law has declared that intoxication is not an excuse for the commission of a crime. While it has long been recognized that intoxication per se is no defense to the fact of guilt, the stated condition of a defendant's mind at the time of the killing in respect of its ability to form the intent to kill, or if formed to deliberate and premeditate thereupon, is now a proper subject for consideration, inquiry, and determination by the jury. Thus, voluntary intoxication will not excuse murder, but it may negative the ability of the defendant to form the specific intent to kill, or the deliberation and premeditation necessary to constitute first degree murder, in which event

than using legal phrases like specific and general intent, Heblich sufficiently and reasonably explained to Jackson the impracticality of a voluntary intoxication defense.[6]

As to the prejudice prong, Jackson must demonstrate "a reasonable probability that, but for counsel's [alleged] errors, [he] would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). "Because this is an objective test, [Jackson] 'cannot make that showing merely by telling [the court] now that he would have gone to trial then if he had gotten different advice.'" United States v. Akinsade, 686 F.3d 248, 261 (4th Cir. 2012) (quoting Pilla v. United States, 668 F.3d 368, 373 (6th Cir. 2012)). Rather, Jackson, in the words of the Supreme Court, "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 372 (2010).

Jackson has not done so here. Had Jackson rejected the offer, he would have faced a death sentence that was not only possible but, as he described it, maybe even "a probability."

---

there is a reduction to second degree murder." Bishop v. United States, 107 F.2d 297, 301 (D.C. Cir. 1939).

[6] Jackson's counsel attempts to frame the issue as a "failure to investigate" the intoxication defense. Counsel argues that Heblich did not investigate a witness who viewed Jackson on the day of the shooting and that Heblich failed to conduct legal research about the intoxication defense. But the Fourth Circuit identified the specific issue more narrowly and limited the certificate of appealability to the advice Heblich gave Jackson, not Heblich's investigative efforts. United States v. Jackson, No. 12-6756, slip op. at 10 (4th Cir. Feb. 7, 2014) (granting a limited certificate of appealability as to "whether the district court erred in ruling that Jackson's counsel was not constitutionally deficient *in advising Jackson that the evidence of his voluntary intoxication would not be admissible . . . to establish that he lacked the requisite specific intent to commit first degree murder*") (emphasis added). Even assuming that a witness corroborated Jackson's claims of intoxication, Heblich did not need that information to reach the same advice he gave Jackson. (Hr'g Tr. 59:5-11) ("based on my assessment of the case and my view of the evidence, I thought that Mr. Jackson was very likely going to be convicted of first degree murder and if not first degree murder, second degree murder, along with the firearms offenses, which were going to generate a sentence anywhere from 50 years to a death sentence") As to performing legal research, Heblich testified he was already familiar with the applicable law on voluntary intoxication, a claim substantiated by the accurate advice he gave Jackson.

(Hr'g Tr. 78:2-5) The facts of the crime were egregious, and Jackson conceded that he understood his chances of succeeding with an intoxication defense were slim. Yet, even if Jackson were successful with that defense, he had nothing practical to gain while risking death. Jackson would have likely received a sentence that, for all intents and purposes, still amounted to the same result: life imprisonment. Under the circumstances, the court finds it would not have been rational for a defendant whose primary objective was to avoid the death penalty to have rejected a plea offer that did just that.

And even from a subjective standpoint, Jackson has offered a strained explanation. Although Jackson claims he would have rejected the plea simply so he could tell his "story,"[7] he also admitted that his primary reason for accepting the plea was "to avoid the death penalty." That being the case, the court cannot agree Jackson would have rejected the plea and faced, in Jackson's words, possible if not probable death. (Hr'g Tr. 78:2-5)

### III.

For the foregoing reasons, the court denies Jackson's motion to vacate.

**ENTER:** June 3, 2014.

UNITED STATES DISTRICT JUDGE

---

[7] Jackson also had the opportunity to tell his story at the guilty plea hearing and at sentencing. Instead, he did not do so at either proceeding and did not object to the stipulated statement of facts at the guilty plea hearing. Such "solemn declarations . . . 'carry a strong presumption of verity.'" United States v. Lemaster, 403 F.3d 216, 221 (4th Cir. 2005) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).